# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 25, 2014          Decided June 13, 2014

No. 13-7017

LARRY ELLIOTT KLAYMAN,
APPELLANT

v.

MARK ZUCKERBERG AND FACEBOOK, INC.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00874)

*Larry Klayman* argued the cause and filed the brief for appellant.

*Craig S. Primis* argued the causes for appellees. With him on the brief was *K. Winn Allen*.

Before: TATEL, BROWN and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Three years ago, plaintiff-appellant Larry Klayman encountered a page on Facebook's social networking website entitled "Third Palestinian

Intifada," which called for Muslims to rise up and kill the Jewish people. Facebook subsequently removed the Third Intifada page from its website, but not promptly enough for Klayman. He filed suit against Facebook and its founder, Mark Zuckerberg, alleging that their delay in removing that page and similar pages constituted intentional assault and negligence. The district court held that the Communications Decency Act of 1996, 47 U.S.C. § 230, shielded Zuckerberg and Facebook from suit. We affirm.

I

In enacting the Communications Decency Act, Congress found that the Internet and related computer services "represent an extraordinary advance in the availability of educational and informational resources," and "offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a). The Internet has done so, Congress stressed, "with a minimum of government regulation." *Id.* Congress accordingly made it the "policy of the United States" to "promote the continued development of the Internet," and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation[.]" *Id.* § 230(b).

To that end, Section 230(c) of the Act commands that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). A later section of the Act adds preemptive bite to that prohibition, providing that "[n]o cause of action may be brought and no liability may be imposed under any State or

local law that is inconsistent with this section." *Id.* § 230(e)(3).

As relevant here, the Act defines a protected "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet[.]" 47 U.S.C. § 230(f)(2). An information content provider, in turn, is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

Facebook is an Internet-based social networking website that allows its users worldwide to share information, opinions, and other content of the users' own choosing for free. *Klayman v. Zuckerberg*, 910 F. Supp. 2d 314, 316 (D.D.C. 2012). Like millions of others, Larry Klayman maintains a Facebook account. When he joined Facebook, the Statement of Rights and Responsibilities for users advised Klayman that Facebook does its "best to keep Facebook safe, but we cannot guarantee it," J.A. 23, and that "YOU USE IT AT YOUR OWN RISK. WE ARE PROVIDING FACEBOOK 'AS IS' WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES," J.A. 26 (capitalization in original). The Statement continued: "FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES[.]" J.A. 27 (capitalization in original).

While using the site a few years ago, Klayman came across a page entitled "Third Palestinian Intifada," which called for an uprising to take place after the completion of

Islamic prayers on May 15, 2011, and proclaimed that "Judgment Day will be brought upon us only once Muslims have killed all the Jews." More than 360,000 Facebook users were members of the group; three similar pages calling for a Third Intifada attracted over 7,000 members. Compl. ¶ 7.

At some point, Israel's Minister for Public Diplomacy wrote a letter to Facebook and Mark Zuckerberg to request that the Intifada pages be removed. Klayman alleges that he also requested removal of the pages, but does not indicate when. After "many days," Facebook removed the pages. Compl. ¶ 12.

Klayman subsequently sued Facebook and Mark Zuckerberg (collectively, "Facebook"), in the Superior Court for the District of Columbia, alleging that their insufficiently prompt removal of the Third Intifada pages constituted intentional assault and negligent breach of a duty of care that Facebook allegedly owed to Klayman. Specifically, Klayman alleged that the Intifada pages "amount[ed] to a threat of the use of force against non-Muslims, and particularly Jews," causing him "reasonable apprehension of severe bodily harm and/ or death." Compl. ¶¶ 15-16. With respect to negligence, Mr. Klayman alleged that, "[a]s a subscriber to Facebook and as a member of the public, Defendants owed Plaintiff a duty of care, which they violated and breached by allowing and furthering the death threats by the Third Palestinian Intifada, and related and similar sites." *Id.* ¶ 19.

Klayman sought an injunction to prevent Facebook from allowing the Intifada page and other similar pages on its website, as well as more than one billion dollars in compensatory and punitive damages. Compl., Prayer for Relief.

Facebook removed the case to the United States District Court for the District of Columbia, and then moved to dismiss the case or, in the alternative, to have it transferred to the Northern District of California. The district court granted the motion to dismiss, FED. R. CIV. P. 12(b)(6), holding that the Communications Decency Act foreclosed tort liability predicated on Facebook's decisions to allow or to remove content from its website.

II

The court below had diversity jurisdiction under 28 U.S.C. § 1332; this court has jurisdiction over the district court's final judgment of dismissal under 28 U.S.C. § 1291. We review *de novo* a motion to dismiss for failure to state a claim, accepting as true the factual allegations stated in the complaint and drawing all inferences in favor of the nonmoving party. *See, e.g.*, *Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014).

Preemption under the Communications Decency Act is an affirmative defense, but it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint. *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Jones v. Horne*, 634 F.3d 588, 600 (D.C. Cir. 2011). Normally we afford a liberal reading to a complaint filed by a *pro se* plaintiff. *See*, *e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Rhodes v. United States*, 518 F. Supp. 2d 285, 287 (D.D.C. 2007). This Court has not yet decided, however, whether that rule applies when the *pro se* plaintiff is a practicing lawyer like Klayman. *See, e.g.*, *Richards v. Duke Univ.*, 480 F. Supp. 2d. 222, 234 (D.D.C. 2007). We need not resolve that question here because, even under a generous

reading of the complaint, the Communications Decency Act forbids this suit.

## III

The Communications Decency Act mandates dismissal if (i) Facebook is a "provider or user of an interactive computer service," (ii) the information for which Klayman seeks to hold Facebook liable was "information provided by another information content provider," and (iii) the complaint seeks to hold Facebook liable as the "publisher or speaker" of that information. *See* 47 U.S.C. § 230(c)(1). We hold that, on the face of this complaint, all three prongs of that test are satisfied.

*First*, Facebook qualifies as an interactive computer service because it is a service that provides information to "multiple users" by giving them "computer access * * * to a computer server," 47 U.S.C. § 230(f)(2), namely the servers that host its social networking website. When Facebook users like Klayman browse the site and review the pages of other users, *see* Compl. ¶ 7, they do so by gaining access to information stored on Facebook's servers.

Mark Zuckerberg, too, qualifies for protection because he is a "provider" of Facebook's interactive computer service, 47 U.S.C. § 230(c)(1), and Klayman's complaint seeks to hold him accountable for his role in making that service available, Compl. ¶ 12.

Klayman does not seriously dispute that Facebook meets the statutory definition of an interactive computer service, or that Zuckerberg, as a matter of statutory text, provides such a service. He argues, instead, that Facebook should not qualify

because it "can control the contents posted on [its] website." Appellant's Br. 21. The short answer is that Congress did not write that additional limitation into the Act, and it is this court's obligation to enforce statutes as Congress wrote them. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-462 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

Worse still, Klayman's reading would put Section 230 at war with itself. Section 230(c)(2) prohibits holding providers of interactive computer services liable for "any action voluntarily taken * * * to restrict access to" content that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2)(A). It would make nonsense of the statute to say that interactive computer services must lack the capacity to police content when the Act expressly provides them with immunity for doing just that.

*Second*, the complaint acknowledges that the objected-to information on the Third Intifada pages was provided by third party users, not Facebook itself. The complaint charges the defendants only with "allowing" the pages to exist and "furthering" them by not "remov[ing] these postings." Compl. ¶ 19; *see also, e.g.*, *id.* ¶ 4 (Facebook has been "used [as] a vehicle for bad purposes" in this case); *id.* ¶ 7 (Facebook "refused" to "take down the page and similar and related pages").

Indeed, the complaint nowhere alleges or even suggests that Facebook provided, created, or developed any portion of the content that Klayman alleges harmed him. Instead, liability in this complaint rests on "information provided by

another information content provider," within the meaning of Section 230(c)(1). This case thus presents no occasion to address the outer bounds of preemption under the Act; it is enough here to hold that a website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online. *Compare, e.g.*, *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1166 (9th Cir. 2008) (en banc) (housing website that required users to disclose their sex, family status, and sexual orientation, as well as those of their desired roommate, in violation of federal housing law, not entitled to Communications Decency Act protection), *with Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 257 (4th Cir. 2009) (website that did not "contribute[] to the allegedly fraudulent nature of the comments at issue" protected by the Communications Decency Act).

Klayman alleges that Facebook collects data on its users and their activities, which it employs to make its advertising more profitable. Appellant's Br. 26. Even if true, that would be irrelevant to Klayman's theories of liability. Facebook could only collect such data about the Intifada pages after some third party had created the pages and their content.

*Third*, Klayman's complaint seeks, for liability purposes, to treat the defendants as "publisher[s]" of the offending content. 47 U.S.C. § 230(c)(1). Although the statute does not define "publisher," its ordinary meaning is "one that makes public," and "the reproducer of a work intended for public consumption." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1837 (1981); *cf. also* RESTATEMENT (SECOND) OF TORTS § 577 (1977) ("Publication of defamatory matter" means both the communication of, and the failure to remove,

the relevant content.). Indeed, the very essence of publishing is making the decision whether to print or retract a given piece of content—the very actions for which Klayman seeks to hold Facebook liable. *See* Compl. ¶¶ 17-20. Specifically, the assault count of the complaint turns on Facebook's allowing the Third Intifada pages to exist on its website in the first place. Compl. ¶ 17. And the negligence claim relies on the timing of Facebook's removal of the pages. Compl. ¶ 19.

Other circuits agree, holding that similar conduct falls under Section 230's aegis. *See, e.g.*, *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997) (the Communications Decency Act protects against liability for the "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content"); *Green v. America Online*, 318 F.3d 465, 471 (3d Cir. 2003) (same); *Universal Communications Systems, Inc. v. Lycos, Inc.*, 478 F.3d 413, 422 (1st Cir. 2007) (same); *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (no liability under the Act for "decisions relating to the monitoring, screening, and deletion of content" by an interactive computer service provider) (quoting *Green*, 318 F.3d at 471); *Roommates.com*, 521 F.3d at 1170-1171 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.")[*]

---

[*] Because the conduct for which Klayman seeks to hold Facebook liable falls within the heartland meaning of "publisher," this case presents no occasion to define when other types of publishing activities might shade into creating or developing content.

Klayman objects that his claims "do not derive from Appellees' status or conduct as a publisher or speaker but are based on Appellees' breach of its duties arising from the special relationship between the parties as a result of their contractual relationship and contractual obligations." Appellant's Br. 23. In particular, he points to a section of Facebook's Statement of Rights and Responsibilities, which says: "We do our best to keep Facebook safe * * *." *Id.* at 24.

That argument does not work. To begin with, Klayman omits the end of that sentence, which reads "but we cannot guarantee it." J.A. 23. Klayman also overlooks the Statement's express warning that "FACEBOOK IS NOT RESPONSIBLE FOR THE ACTIONS, CONTENT, INFORMATION, OR DATA OF THIRD PARTIES." J.A. 27. The plain text of the Statement thus disavows the legal relationship that Klayman asserts.

Moreover, to the extent that Klayman means by this argument to state a contractual basis for liability, no breach of contract claim appears anywhere in the complaint and is accordingly forfeited, as Klayman acknowledges. Appellant's Br. 23. And to the extent that Klayman means, instead, that any such statement allocating rights and responsibilities between interactive computer services and their users by itself gives rise to a heightened state-law duty of care in publishing, that argument fails. State law cannot predicate liability for publishing decisions on the mere existence of the very relationship that Congress immunized from suit. In other words, simply invoking the label "special relationship" cannot transform an admittedly waived contract claim into a non-preempted tort action.

IV

For those reasons, we affirm the district court's judgment of dismissal.

*So ordered.*