# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 18, 2018        Decided February 23, 2018

No. 17-7106

DAWN BENNETT AND
DJ BENNETT HOLDINGS, LLC,
APPELLANTS

v.

GOOGLE, LLC,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-02283)

*Harry J. Jordan* argued the cause and filed the briefs for the appellants.

*John K. Roche* argued the cause and filed the brief for the appellee.

Before: HENDERSON, ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Offended by a third-party blog post, Plaintiff Dawn Bennett (Bennett) and her company, DJ Bennett Holdings, LLC (DJ Bennett), sued Google LLC (Google) for failing to remove the post. They alleged three state-law causes of action: (1) defamation; (2) tortious interference with a business relationship; and (3) intentional infliction of emotional distress. The district court granted Google's motion to dismiss, concluding that the Communications Decency Act (CDA), 47 U.S.C. § 230, immunized Google from liability for the publication of third-party content. We affirm.

**I.**

Bennett owns DJ Bennett, a retailer of high-end sports apparel.[1] Scott Pierson is the founder of The Executive SEO Agency, which provides search engine optimization and marketing (SEO) services. In March 2013, DJ Bennett hired Pierson to provide SEO services, seeking to increase its sales. After a few months, the parties' relationship deteriorated and Pierson agreed to renegotiate his contract and accept slightly less than $20,000 as full payment for his services.

DJ Bennett paid Pierson in five installments but the fifth installment was returned by the post office as "undeliverable." Thereafter, Pierson called DJ Bennett's Vice President and General Merchandise Manager, Anderson McNeill. According to McNeill, Pierson was "hysterical" and "emotionally distraught." Compl. ¶ 10. Pierson threatened DJ Bennett, declaring "I know things, I can do things, and I will shut down your website." *Id.* In response, McNeil explained

---

[1] The relevant facts are drawn from the complaint and are accepted as accurate for this appeal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

that DJ Bennett had attempted to mail Pierson his final check but that it had been returned. Pierson then gave McNeil an alternative address, "the last payment was sent there, and [Pierson] cashed it." *Id.*

After the business relationship fell apart, Pierson wrote a blog titled "DJ Bennett-think-twice-bad business ethics" and published it on the internet through Google. *Id.* ¶ 11. Among other things, the blog asserted that (1) "DJ Bennett, the luxury sporting goods company, did not pay its employees or contractors"; (2) DJ Bennett was "ruthlessly run by Dawn Bennett who also operated Bennett Group Financial Services"; (3) Bennett falsely stated that Pierson had agreed to reduce his hours "as justification for reducing his final invoice by $3,200"; (4) Pierson's counsel described Bennett as "judgment proof"; and (5) "DJ Bennett owes thousands and thousands to many people." *Id.* ¶¶ 11-12. The blog concluded: "I urge you to think twice before giving your patronage to DJ Bennett.com . . . . The website is pretty, but the person running the show is quite contemptible." *Id.* ¶ 12.

Through counsel, Bennett attempted to convince Pierson to remove the post; Pierson refused. Bennett's counsel also contacted Google's general counsel and other senior corporate officers, "asking them to drop Pierson's blog because it violated Google's Guidelines of what is appropriate material for inclusion in blogs." *Id.* ¶ 13. Notwithstanding Bennett's complaints, Google "continues[] to publish Pierson's blog." *Id.* Bennett also alleged that "as of May 23, 2016, not a single comment has been received in two years; Pierson was artificially maintaining his blog in a favorable position by using black-hat tactics, a practice universally condemned by the digital media industry, including Google." *Id.*

4

Google has a "Blogger Content Policy" that regulates, *inter alia*, adult content, child safety, hate speech, crude content, violence, harassment, copyright infringement, and malware and viruses.[2] Joint Appendix (JA) 42-45. Users are encouraged to "flag[]" policy violations through the website. JA 45. If Google finds that the blog does violate its content policies, it may limit access to the blog, delete the blog, disable the author's access or report the user to law enforcement. *Id.* If the blog does not violate Google's policies, Google "will not take any action against the blog or blog owner." *Id.*

**II.**

We review the district court's dismissal *de novo*. *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014). The CDA recognizes that the internet offers "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity."[3] 47 U.S.C. § 230(a)(3). Accordingly, the Act codifies "the policy of the United States (1) to promote the

---

[2] The "Blogger Content Policy" is not attached to the complaint or the motion to dismiss but it is included in the Joint Appendix. Although Google does not challenge its admissibility, it is unclear if we may take judicial notice of it. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (taking judicial notice of *public* records). Because the Policy does not alter our analysis, however, we consider it as background only.

[3] The Communications *Decency* Act is something of a misnomer; the Act does not promote decency so much as it acts as a bulwark against "intrusive government regulation of speech." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997). Although unrestrained speech can often be several shades from decent, *see Cohen v. California*, 403 U.S. 15 (1971), that is the tradeoff that the Congress has apparently endorsed by insulating computer service providers from liability, 47 U.S.C. § 230(c)(1).

continued development of the Internet and other interactive computer services . . . [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet . . . ." 47 U.S.C. § 230(b). In accordance with that policy, section 230 of the CDA contains a "Protection for 'Good Samaritan' blocking and screening of offensive material," which reads: "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). It further states: "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *Id.* § 230(c)(2). To give these provisions teeth, section 230 provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3).

The seminal case of *Zeran v. America Online, Inc.*[4] explained the core functions of the CDA more than two decades ago:

> The amount of information communicated via interactive computer services is . . . staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling

---

[4] On the 20th anniversary of the CDA, *Zeran* was heralded as "internet law's most important judicial decision." Eric Goldman & Jeff Kosseff, *Commemorating the 20th Anniversary of Internet Law's Most Important Judicial Decision*, THE RECORDER (Nov. 10, 2017), perma.cc/RR2M-UZ2M.

> effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

129 F.3d 327, 331 (4th Cir. 1997). The intent of the CDA is thus to promote rather than chill internet speech. *Id.* By the same token, however, the CDA "encourage[s] service providers to self-regulate the dissemination of offensive material over their services." *Id.* In that respect, the CDA corrected the trajectory of earlier state court decisions that had held computer service providers liable when they removed some—but not all—offensive material from their websites. *Id.* (analyzing legislative history and explaining holding of *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)). Put differently, section 230 incentivized companies to neither restrict content nor bury their heads in the sand in order to avoid liability. *Id.* And in doing so, it paved the way for a robust new forum for public speech as well as "a trillion-dollar industry centered around user-generated content." Eric Goldman & Jeff Kosseff, *Commemorating the 20th Anniversary of Internet Law's Most Important Judicial Decision*, THE RECORDER (Nov. 10, 2017), perma.cc/RR2M-UZ2M.

Like other circuits, we have followed *Zeran*'s lead and created a three-part test to determine CDA preemption.

*Klayman*, 753 F.3d at 1357-59 (citing *Zeran* and related precedent from other circuits). Google can establish immunity by showing that (1) it is a "provider or user of an interactive computer service"; (2) the relevant blog post contains "information provided by another information content provider"; and (3) the complaint seeks to hold Google liable as the "publisher or speaker" of the blog post. *Id.* at 1357 (quoting 47 U.S.C. § 230(c)). Thus, there is a dividing line between "interactive computer service"[5] providers—which are generally eligible for CDA section 230 immunity—and "information content provider[s],"[6] which are not entitled to immunity. *Id.* The law, then, distinguishes "service" from "content." *Id.*

In *Klayman*, we held that "a website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online." *Id.* at 1358. We noted that, although the Facebook website's "Statement of Rights and Responsibilities" might create an independent cause of action for breach of contract, the statement did not change the fact that the plaintiff was seeking to hold Facebook liable as a "publisher" of the objectionable material. *Id.* at 1359. Accordingly, we affirmed the district court's dismissal of the

---

[5]  "The term 'interactive computer service' means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."  47 U.S.C. § 230(f)(2).

[6]  "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  47 U.S.C. § 230(f)(3).

plaintiff's claims pursuant to section 230 of the CDA. *Id.*; *see also Zeran*, 129 F.3d at 331 (rejecting argument that defendant was "distributor" rather than "publisher" under CDA because it acquired "knowledge of the defamatory statements' existence").[7]

This case is controlled by the three-part test in *Klayman*. First, as many other courts have found, Google qualifies as an "interactive computer service" provider because it "provides or enables computer access by multiple users to a computer

---

[7] Bennett places great reliance on the Ninth Circuit's holding in *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (en banc). We of course are not bound by extra-circuit precedent but we nonetheless take a moment to distinguish *Roommates.com*, concluding that it cannot bear the weight of Bennett's reliance because it marks an outer limit of CDA immunity—a limit that this case does not even approach. In *Roommates.com*, the court held that a website can simultaneously be an "interactive computer service" provider and an "information content provider" (e.g., it can provide both services and content). *Roommates.com*, 521 F.3d at 1162. The court concluded that the defendant had, "at least in part," helped develop content on its website by requiring users to select from a "limited set of pre-populated answers" as part of the registration process. *Id.* at 1166. For example, when creating a "Roommates.com" profile, the user had to state his sex and sexual orientation and identify whether he had children. *Id.* at 1161-62. Because Roommates.com created the universe of pre-populated answers, required users to answer its questions before registering and used those answers in providing tailored services to its users, the court held that Roommates.com was a content provider as well as a service provider and that it was not entitled to CDA immunity for the content that remained on its site. *Id.* at 1164. In so holding, the Ninth Circuit emphasized that "Congress sought to immunize the *removal* of user-generated content, not the *creation* of content." *Id.* at 1163 (emphasis in original).

server."  47 U.S.C. § 230(f)(2); *see, e.g.*, *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006), *aff'd* 242 F. App'x 833 (3d Cir. 2007) ("[T]here is no doubt that Google qualifies as an 'interactive computer service' and not an 'information content provider.'").  Indeed, Bennett concedes that fact.  Appellant's Br. 6 ("Google provides interactive computer services, including websites and social media platforms.").  Second, Bennett alleges that only Pierson—and not Google—created the offensive content on the blog.  Compl. ¶¶ 11-12.

Third, Bennett seeks to hold Google liable as a publisher of the content.  Bennett argues that by establishing and enforcing its Blogger Content Policy, Google is influencing—and thus creating—the content it publishes.  This argument ignores the core of CDA immunity, that is, "the very essence of publishing is making the decision whether to print or retract a given piece of content."  *Klayman*, 753 F.3d at 1359.  In other words, there is a sharp dividing line between input and output in the CDA context.  *Id.*  Here, the input is the content of Pierson's negative blog about Bennett's business; that blog was created exclusively by Pierson.  Google's role was strictly one of output control; it had the choice of leaving Pierson's post on its website or retracting it.  It did not edit Pierson's post nor did it dictate what Pierson should write.  Because Google's choice was limited to a "yes" or "no" decision whether to remove the post, its action constituted "the very essence of publishing."  *Id.*

In sum, the CDA "allows [computer service providers] to establish standards of decency without risking liability for doing so."  *Green v. Am. Online, Inc.*, 318 F.3d 465, 472 (3d Cir. 2003).  Although "other types of publishing activities might shade into creating or developing content," the decision to print or retract is fundamentally a publishing decision for

which the CDA provides explicit immunity. *Klayman*, 753 F.3d at 1359 n.*; *see Zeran*, 129 F.3d at 332 ("[B]oth the negligent communication of a defamatory statement and the failure to remove such a statement when first communicated by another party . . . constitute publication."). "None of this means, of course, that the original culpable party who posts defamatory messages [will] escape accountability." *Zeran*, 129 F.3d at 330. It means only that, if Bennett takes issue with Pierson's post, her legal remedy is against Pierson himself as the content provider, not against Google as the publisher.

For the foregoing reasons, the judgment of dismissal is affirmed.

*So ordered.*