Droney, Circuit Judge:
 

 The principal question presented in this appeal is whether
 
 47 U.S.C. § 230
 
 (c)(1), a provision enacted by the Communications Decency Act of 1996, shields Defendant-Appellee Facebook, Inc., from civil liability as to Plaintiffs-Appellants' federal anti-terrorism claims. Plaintiffs include the U.S. citizen victims, and relatives and representatives of the estates of those victims, of certain terrorist attacks committed by Hamas in Israel. They contend that Facebook unlawfully provided Hamas, a U.S.-designated foreign terrorist organization, with a communications platform that enabled those attacks.
 

 The district court granted Facebook's motion to dismiss plaintiffs' First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) on the basis of Section 230(c)(1) immunity, an affirmative defense. After entering judgment without prejudice to moving to file an amended complaint, the district court denied with prejudice plaintiffs' motion to file a second amended complaint on the basis that the proposed complaint did not cure the deficiencies in the First Amended Complaint.
 

 On appeal, plaintiffs argue that the district court improperly dismissed their claims because Section 230(c)(1) does not provide immunity to Facebook under the circumstances of their allegations.
 

 We conclude that the district court properly applied Section 230(c)(1) to plaintiffs' federal claims. Also, upon our review of plaintiffs' assertion of diversity jurisdiction over their foreign law claims,
 
 28 U.S.C. § 1332
 
 (a), we conclude that such jurisdiction is lacking. Accordingly, we affirm the judgment of the district court as to the federal claims. We also dismiss the foreign law claims, but without prejudice.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 I. Allegations in Plaintiffs' Complaint
 

 [2]
 

 Because this case comes to us on a motion to dismiss, we recount the facts as plaintiffs provide them to us, treating as true the allegations in their complaint.
 
 See
 

 Galper v. JP Morgan Chase Bank, N.A.
 
 ,
 
 802 F.3d 437
 
 , 442 (2d Cir. 2015).
 

 A. The Attacks
 

 Hamas is a Palestinian Islamist organization centered in Gaza. It has been designated a foreign terrorist organization by the United States and Israel. Since it was formed in 1987, Hamas has conducted thousands of terrorist attacks against civilians in Israel.
 

 Plaintiffs' complaint describes terrorist attacks by Hamas against five Americans in Israel between 2014 and 2016. Yaakov Naftali Fraenkel, a teenager, was kidnapped by a Hamas operative in 2014 while walking home from school in Gush Etzion, near Jerusalem, and then was shot to death. Chaya Zissel Braun, a 3-month-old baby, was killed at a train station in Jerusalem in 2014 when a Hamas operative drove a car into a crowd. Richard Lakin died after Hamas members shot and stabbed him in an attack on a bus in Jerusalem in 2015. Graduate student Taylor
 Force was stabbed to death by a Hamas attacker while walking on the Jaffa boardwalk in Tel Aviv in 2016. Menachem Mendel Rivkin was stabbed in the neck in 2016 by a Hamas operative while walking to a restaurant in a town near Jerusalem. He suffered serious injuries but survived. Except for Rivkin, plaintiffs are the representatives of the estates of those who died in these attacks and family members of the victims.
 

 B. Facebook's Alleged Role in the Attacks
 

 1. How Facebook Works
 

 Facebook operates an "online social network platform and communications service[ ]." App'x 230. Facebook users populate their own "Facebook 'pages' " with "content," including personal identifying information and indications of their particular "interests." App'x 250-51, 345. Organizations and other entities may also have Facebook pages. Users can post content on others' Facebook pages, reshare each other's content, and send messages to one another. The content can be text-based messages and statements, photos, web links, or other information.
 

 Facebook users must first register for a Facebook account, providing their names, telephone numbers, and email addresses. When registering, users do not specify the nature of the content they intend to publish on the platform, nor does Facebook screen new users based on its expectation of what content they will share with other Facebook users. There is no charge to prospective users for joining Facebook.
 
 [3]
 

 Facebook does not preview or edit the content that its users post. Facebook's terms of service specify that a user "own[s] all of the content and information [the user] post[s] on Facebook, and [the user] can control how it is shared through [the user's] privacy and application settings." App'x 252 (alterations in original).
 

 While Facebook users may view each other's shared content simply by visiting other Facebook pages and profiles, Facebook also provides a personalized "newsfeed" page for each user. Facebook uses algorithms-"a precisely defined set of mathematical or logical operations for the performance of a particular task,"
 
 Algorithm
 
 , Oxford English Dictionary (3d ed. 2012)-to determine the content to display to users on the newsfeed webpage. Newsfeed content is displayed within banners or modules and changes frequently. The newsfeed algorithms-developed by programmers employed by Facebook-automatically analyze Facebook users' prior behavior on the Facebook website to predict and display the content that is most likely to interest and engage those particular users. Other algorithms similarly use Facebook users' behavioral and demographic data to show those users third-party groups, products, services, and local events likely to be of interest to them.
 

 Facebook's algorithms also provide "friend suggestions," which, if accepted by the user, result in those users seeing each other's shared content. App'x 346-47. The friend-suggestion algorithms are based on such factors as the users' common membership in Facebook's online "groups," geographic location, attendance at events, spoken language, and mutual friend connections on Facebook. App'x 346.
 

 Facebook's advertising algorithms and "remarketing" technology also allow advertisers on Facebook to target specific ads to its users who are likely to be most interested
 in them and thus to be most beneficial to those advertisers. App'x 347. Those advertisements are displayed on the users' pages and other Facebook webpages. A substantial portion of Facebook's revenues is from such advertisers.
 

 2. Hamas's Use of Facebook
 

 [4]
 

 Plaintiffs allege that Hamas used Facebook to post content that encouraged terrorist attacks in Israel during the time period of the attacks in this case. The attackers allegedly viewed that content on Facebook. The encouraging content ranged in specificity; for example, Fraenkel, although not a soldier, was kidnapped and murdered after Hamas members posted messages on Facebook that advocated the kidnapping of Israeli soldiers. The attack that killed the Braun baby at the light rail station in Jerusalem came after Hamas posts encouraged car-ramming attacks at light rail stations. By contrast, the killer of Force is alleged to have been a Facebook user, but plaintiffs do not set forth what specific content encouraged his attack, other than that "Hamas ... use[d] Facebook to promote terrorist stabbings." App'x 335.
 

 Hamas also used Facebook to celebrate these attacks and others, to transmit political messages, and to generally support further violence against Israel. The perpetrators were able to view this content because, although Facebook's terms and policies bar such use by Hamas and other designated foreign terrorist organizations, Facebook has allegedly failed to remove the "openly maintained" pages and associated content of certain Hamas leaders, spokesmen, and other members. App'x 229. It is also alleged that Facebook's algorithms directed such content to the personalized newsfeeds of the individuals who harmed the plaintiffs. Thus, plaintiffs claim, Facebook enables Hamas "to disseminate its messages directly to its intended audiences," App'x 255, and to "carry out the essential communication components of [its] terror attacks," App'x 256.
 

 II. Facebook's Antiterrorism Efforts
 

 A. Intended Uses of Facebook
 

 Facebook has Terms of Service that govern the use of Facebook and purport to incorporate Facebook's Community Standards.
 
 [5]
 
 In its Terms of Service, Facebook represents that its services are intended to "[c]onnect you with people and organizations you care about," by, among other things, "[p]rovid[ing] a personalized experience" and "[h]elp[ing] you discover content, products, and services that may interest you."
 
 Terms of Service
 
 , Facebook, https://www.facebook.com/terms.php (last visited June 26, 2019). To do so, Facebook "must collect and use your personal data,"
 
 id
 
 ., subject to a detailed "Data Policy,"
 
 Data Policy
 
 , Facebook, https://www.facebook.com/about/privacy/update
 (last visited June 26, 2019). Facebook also uses information about its users to sell targeted online advertising and to provide advertisers with data on the effectiveness of their ads.
 
 How do we use this information?
 
 ,
 
 Data Policy
 
 , Facebook, https://www.facebook.com/about/privacy/update (last visited May 23, 2019).
 

 B. Prohibited Uses of Facebook
 

 According to the current version of Facebook's Community Standards, Facebook "remove[s] content that expresses support or praise for groups, leaders, or individuals involved in,"
 
 inter alia
 
 , "[t]errorist activity."
 
 2. Dangerous Individuals and Organizations
 
 ,
 
 Community Standards
 
 , Facebook, https://www.facebook.com/communitystandards/dangerous_individuals_organizations (last visited June 26, 2019). "Terrorist organizations and terrorists" may not "maintain a presence" on Facebook, nor is "coordination of support" for them allowed.
 
 Id
 
 . Facebook "do[es] not allow symbols that represent any [terrorist] organizations or [terrorists] to be shared on [the] platform without context that condemns or neutrally discusses the content."
 
 Id
 
 . In addition, Facebook purports to ban "hate speech" and to "remove content that glorifies violence or celebrates the suffering or humiliation of others."
 
 Objectionable Content
 
 ,
 
 Community Standards
 
 , Facebook, https://www.facebook.com/communitystandards/objectionable_content (last visited June 26, 2019).
 

 Facebook's Terms of Service also prohibit using its services "to do or share anything" that is,
 
 inter alia
 
 , "unlawful" or that "infringes or violates someone else's rights."
 
 [6]
 

 Terms of
 

 Service
 
 ,
 
 supra
 
 . Violating any of these policies may result in Facebook suspending or disabling a user's account, removing the user's content, blocking access to certain features, and contacting law enforcement.
 
 Id
 
 .
 

 According to recent testimony by Facebook's General Counsel in a United States Senate hearing, Facebook employs a multilayered strategy to enforce these policies and combat extremist content on its platform.
 
 [7]
 
 Facebook claimed in the hearing that most of the content it removes is identified by Facebook's internal procedures before it is reported by users. For example, terrorist photos or videos that users attempt to upload are matched against an inventory of known terrorist content. Facebook is also experimenting with artificial intelligence to block or remove "text that might be advocating for terrorism." App'x 373. When Facebook detects terrorist-related content, it also uses artificial intelligence to identify similar, socially interconnected accounts, content, and pages that may themselves support terrorism.
 

 The General Counsel also testified that, for content that is not automatically detected, Facebook employs thousands of people who respond to user reports of inappropriate content and remove such
 content.
 
 Id.
 
 Facebook also has a 150-person team of "counterterrorism specialists," including academics, engineers, and former prosecutors and law enforcement officers.
 
 [8]
 

 Id
 
 .
 

 III. District Court Proceeding
 

 Plaintiffs brought this action on July 10, 2016, in the United States District Court for the Southern District of New York. On consent of the parties, the action was transferred to the United States District Court for the Eastern District of New York on September 16, 2016.
 
 [9]
 
 In their First Amended Complaint, Plaintiffs claimed that, under
 
 18 U.S.C. § 2333
 
 , Facebook was civilly liable for aiding and abetting Hamas's acts of international terrorism; conspiring with Hamas in furtherance of acts of international terrorism; providing material support to terrorists; and providing material support to a designated foreign terrorist organization.
 
 [10]
 
 Plaintiffs also alleged that the district court had diversity-based subject matter jurisdiction under
 
 28 U.S.C. § 1332
 
 (a)(2) to adjudicate Plaintiffs' Israeli-law tort claims arising from the same conduct.
 

 Facebook moved to dismiss plaintiffs' claims for lack of personal jurisdiction under Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6). The district court determined that it had personal jurisdiction over Facebook, a ruling that Facebook does not challenge on appeal. But the district court also held that
 
 47 U.S.C. § 230
 
 (c)(1) foreclosed plaintiffs' claims because they impermissibly involved "treat[ing]" Facebook "as the publisher or speaker of any information provided by" Hamas.
 
 Cohen v. Facebook, Inc.
 
 ,
 
 252 F.Supp.3d 140
 
 , 155-58 (E.D.N.Y. 2017) (quoting
 
 47 U.S.C. § 230
 
 (c)(1) ).
 
 [11]
 
 On May 18, 2017, the district court granted the motion to dismiss under Rule 12(b)(6) and entered judgment in Facebook's favor,
 without prejudice to plaintiffs seeking leave to file an amended complaint.
 

 Plaintiffs then filed a Rule 59(e) motion to alter the judgment, asking the district court to reconsider its dismissal of their First Amended Complaint, and filed a motion seeking leave to file a second amended complaint. The proposed complaint retained all of plaintiffs' prior claims for relief and added a claim that Facebook had concealed its alleged material support to Hamas. In January 2018, the district court denied plaintiffs' motions with prejudice, holding that plaintiffs' proposed second amended complaint was futile in light of
 
 47 U.S.C. § 230
 
 (c)(1). Plaintiffs timely appealed.
 

 STANDARD OF REVIEW
 

 Because the district court determined that it was futile to allow plaintiffs to file a second amended complaint, we evaluate that proposed complaint "as we would a motion to dismiss, determining whether [it] contains enough facts to state a claim to relief that is plausible on its face."
 
 [12]
 

 Ind. Pub. Ret. Sys. v. SAIC, Inc.
 
 ,
 
 818 F.3d 85
 
 , 92 (2d Cir. 2016) (citation and internal quotation marks omitted). We accept as true all alleged facts in both the First Amended Complaint and the proposed second amended complaint.
 
 [13]
 

 See
 

 Ashcroft v. Iqbal
 
 ,
 
 556 U.S. 662
 
 , 678,
 
 129 S.Ct. 1937
 
 ,
 
 173 L.Ed.2d 868
 
 (2009). We also review
 
 de novo
 
 a district court's grant of a Rule 12(b)(6) motion to dismiss on the basis of an affirmative defense.
 
 See
 

 Ricci v. Teamsters Union Local 456
 
 ,
 
 781 F.3d 25
 
 , 26 (2d Cir. 2015).
 

 DISCUSSION
 

 On appeal, plaintiffs contend that the district court improperly held that Section 230(c)(1) barred their claims. Plaintiffs argue that their claims do not treat Facebook as the "publisher" or "speaker" of content
 
 [14]
 
 provided by Hamas, as Section 230(c)(1) requires for immunity. Plaintiffs similarly contend that Facebook contributed to that content through its algorithms. Plaintiffs also argue that to apply Section 230(c)(1) to their claims based on Facebook's and Hamas's actions taken outside of the United States would constitute the unlawful extraterritorial application of that statute. In addition, plaintiffs maintain that
 
 47 U.S.C. § 230
 
 (e)(1), which provides that Section 230 shall not be "construed to impair the enforcement of ... any ... Federal criminal statute," precludes the application of Section 230(c)(1) to their claims, that the Anti-Terrorism Act's ("ATA") civil remedies provision,
 
 18 U.S.C. § 2333
 
 , irreconcilably conflicts with Section 230(c)(1), and that the Justice Against Sponsors of Terrorism Act ("JASTA") impliedly narrowed or repealed Section 230(c)(1). Lastly, plaintiffs contend that Section 230(c)(1) cannot apply to their claims brought under the foreign law of Israel.
 

 In response to plaintiffs' claims, Facebook contends that Section 230(c)(1) provides it immunity and that, even absent such immunity, plaintiffs fail to plausibly allege that Facebook assisted Hamas in the ways required for their federal antiterrorism claims and Israeli law claims.
 

 We first turn to the issues regarding
 Section 230(c)(1).
 
 [15]
 

 I. Background of Section 230(c)(1)
 

 The primary purpose of the proposed legislation that ultimately resulted in the Communications Decency Act ("CDA") "was to protect children from sexually explicit internet content."
 
 FTC v. LeadClick Media, LLC
 
 ,
 
 838 F.3d 158
 
 , 173 (2d Cir. 2016) (citing 141 Cong. Rec. S1953 (daily ed. Feb. 1, 1995) (statement of Sen. Exon)). Section 230, though-added as an amendment to the CDA bill,
 
 id
 
 . -was enacted "to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum,"
 
 Ricci
 
 ,
 
 781 F.3d at 28
 
 (quoting
 
 Zeran v. Am. Online
 
 ,
 
 Inc.
 
 ,
 
 129 F.3d 327
 
 , 330 (4th Cir. 1997) ). Indeed, Congress stated in Section 230 that "[i]t is the policy of the United States-(1) to promote the continued development of the Internet and other interactive computer services and other interactive media; [and] (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation."
 
 47 U.S.C. § 230
 
 (b)(1)-(2).
 

 In the seminal Fourth Circuit decision interpreting the immunity of Section 230 shortly after its enactment,
 
 Zeran v. America Online, Inc.
 
 , that court described Congress's concerns underlying Section 230 :
 

 The amount of information communicated via interactive computer services is ... staggering. The specter of ... liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress ... chose to immunize service providers to avoid any such restrictive effect.
 

 129 F.3d at 331
 
 .
 

 The addition of Section 230 to the proposed CDA also "assuaged Congressional concern regarding the outcome of two inconsistent judicial decisions,"
 
 Cubby, Inc. v. CompuServe, Inc.,
 

 776 F. Supp. 135
 
 (S.D.N.Y. 1991) and
 
 Stratton Oakmont, Inc. v. Prodigy Servs. Co.
 
 , No. 31063/94,
 
 1995 WL 323710
 
 (N.Y. Sup. Ct. May 24, 1995), both of which "appl[ied] traditional defamation law to internet providers,"
 
 LeadClick
 
 ,
 
 838 F.3d at 173
 
 . As we noted in
 
 LeadClick
 
 , "[t]he first [decision] held that an interactive computer service provider could not be liable for a third party's defamatory statement ... but the second imposed liability where a service provider filtered its content in an effort to block obscene material."
 

 Id.
 

 (citations omitted) (citing 141 Cong. Rec. H8469-70 (daily ed. Aug. 4, 1995 (statement of Rep. Cox))).
 

 To "overrule
 
 Stratton
 
 ,"
 
 id
 
 ., and to accomplish its other objectives, Section 230(c)(1) provides that "[n]o provider ... of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information
 content provider."
 
 [16]
 

 47 U.S.C. § 230
 
 (c)(1). Subject to certain delineated exceptions,
 
 id
 
 . § 230(e), Section 230(c)(1) thus shields a defendant from civil liability when: (1) it is a "provider or user of an interactive computer service," as defined by § 230(f)(2) ; (2) the plaintiff's claims "treat[ ]" the defendant as the "publisher or speaker" of information,
 

 id.
 

 § 230(c)(1) ; and (3) that information is "provided by" an "information content provider,"
 
 id
 
 . § 230(f)(3), other than the defendant interactive computer service.
 

 In light of Congress's objectives, the Circuits are in general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity.
 
 See
 

 LeadClick,
 

 838 F.3d at 173
 
 (collecting cases);
 
 Marshall's Locksmith Serv. Inc. v. Google, LLC
 
 ,
 
 925 F.3d 1263
 
 , 1267 (D.C. Cir. 2019) ("Congress inten[ded] to confer broad immunity for the re-publication of third-party content.");
 
 Jane Doe No. 1 v. Backpage.com, LLC
 
 ,
 
 817 F.3d 12
 
 , 18 (1st Cir. 2016) ("There has been near-universal agreement that section 230 should not be construed grudgingly.");
 
 Jones v. Dirty World Entm't Recordings LLC,
 

 755 F.3d 398
 
 , 408 (6th Cir. 2014) ("[C]lose cases ... must be resolved in favor of immunity.") (quoting
 
 Fair Hous. Council v. Roommates.Com, LLC,
 

 521 F.3d 1157
 
 , 1174 (9th Cir. 2008) (en banc));
 
 Doe v. MySpace, Inc.
 
 ,
 
 528 F.3d 413
 
 , 418 (5th Cir. 2008) ("Courts have construed the immunity provisions in § 230 broadly in all cases arising from the publication of user-generated content.");
 
 Almeida v. Amazon.com, Inc.,
 

 456 F.3d 1316
 
 , 1321 (11th Cir. 2006) ("The majority of federal circuits have interpreted [ Section 230 ] to establish broad ... immunity.");
 
 Carafano v. Metrosplash.com, Inc.
 
 ,
 
 339 F.3d 1119
 
 , 1123 (9th Cir. 2003) (" § 230(c) provides broad immunity for publishing content provided primarily by third parties.") (citation omitted);
 
 Zeran,
 

 129 F.3d at 330
 
 (4th Cir. 1997) ("Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium.").
 

 II. Whether Section 230(c)(1) Protects Facebook's Alleged Conduct
 

 [17]
 

 The parties agree that Facebook is a provider of an "interactive computer service," but dispute whether plaintiffs' claims allege that (1) Facebook is acting as the protected publisher of information, and (2) the challenged information is provided by Hamas, or by Facebook itself.
 
 [18]
 

 A. Whether Plaintiffs' Claims Implicate Facebook as a "Publisher" of Information
 

 Certain important terms are left undefined by Section 230(c)(1), including "publisher."
 
 47 U.S.C. § 230
 
 (c)(1). This Circuit and others have generally looked to that term's ordinary meaning:
 
 [19]
 
 "one that makes public,"
 
 Klayman v. Zuckerberg
 
 ,
 
 753 F.3d 1354
 
 , 1359 (D.C. Cir. 2014) (citing Webster's Third New International Dictionary 1837 (1981)); "the reproducer of a work intended for public consumption,"
 
 LeadClick
 
 ,
 
 838 F.3d at
 
 175 (citing
 
 Barnes v. Yahoo!, Inc.
 
 ,
 
 570 F.3d 1096
 
 , 1102 (9th Cir. 2009) (quoting Webster's Third New International Dictionary 1837 (Philip Babcock Gove ed., 1986))); and "one whose business is publication,"
 

 id.
 

 Consistent with these definitions, in
 
 Zeran v. America Online
 
 ,
 
 Inc
 
 ., the Fourth Circuit concluded that "[e]ven distributors are considered to be publishers," including "[t]hose who are in the business of making their facilities available to disseminate ... the information gathered by others."
 
 129 F.3d at 332
 
 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 113, at 803 (5th ed. 1984)). The courts' generally broad construction of Section 230(c)(1) in favor of immunity "has resulted in a capacious conception of what it means to treat a website operator as the publisher ... of information provided by a third party."
 
 Backpage.com
 
 ,
 
 817 F.3d at 19
 
 .
 

 Plaintiffs seek to hold Facebook liable for "giving Hamas a forum with which to communicate and for actively bringing Hamas' message to interested parties." Appellants' Reply Br. 37;
 
 see also, e.g.
 
 , Appellants' Br. 50-51 (arguing that the federal anti-terrorism statutes "prohibit[ ] Facebook from supplying Hamas a platform and communications services"). But that alleged conduct by Facebook falls within the heartland of what it means to be the "publisher" of information under Section 230(c)(1). So, too, does Facebook's alleged failure to delete content from Hamas members' Facebook pages.
 
 See
 

 LeadClick
 
 ,
 
 838 F.3d at 174
 
 (stating that acting as the "publisher" under Section 230(c)(1) includes the decision whether to "withdraw" content).
 

 Plaintiffs also argue that Facebook does not act as the publisher of Hamas's content within the meaning of Section 230(c)(1) because it uses algorithms to suggest content to users, resulting in "matchmaking." Appellants' Br. 51-52. For example, plaintiffs allege that Facebook's "newsfeed" uses algorithms that predict and show the third-party content that is most likely to interest and engage users. Facebook's algorithms also provide "friend suggestions," based on analysis of users' existing social connections on Facebook and other behavioral and demographic data. And, Facebook's advertising algorithms and "remarketing" technology allow advertisers to target ads to its users who are likely most interested in those ads.
 

 We disagree with plaintiffs' contention that Facebook's use of algorithms renders it a non-publisher. First, we find no basis in the ordinary meaning of "publisher," the other text of Section 230, or decisions interpreting Section 230, for concluding that an interactive computer service is not the "publisher" of third-party information when it uses tools such as algorithms that are designed to match that information with a consumer's interests.
 
 [20]
 

 Cf., e.g.,
 

 Roommates.Com,
 

 521 F.3d at 1172
 
 (recognizing that Matchmaker.com website, which "provided neutral tools specifically designed to match romantic partners depending on their voluntary inputs," was immune under Section 230(c)(1) ) (citing
 
 Carafano, Inc.
 
 ,
 
 339 F.3d 1119
 
 );
 
 Carafano
 
 ,
 
 339 F.3d at 1124-25
 
 ("Matchmaker's decision to structure the information provided by users allows the company to offer additional features, such as 'matching' profiles with similar characteristics ..., [and such features] [a]rguably promote[ ] the expressed Congressional policy 'to promote the continued development of the Internet and other interactive computer services.'
 
 47 U.S.C. § 230
 
 (b)(1).");
 
 Herrick v. Grindr, LLC
 
 ,
 
 765 F. App'x 586
 
 , 591 (2d Cir. 2019) (summary order) ("To the extent that [plaintiff's claims] are premised on Grindr's [user-profile] matching and geolocation features, they are likewise barred ....").
 
 [21]
 

 Indeed, arranging and distributing third-party information inherently forms "connections" and "matches" among speakers, content, and viewers of content, whether in interactive internet forums or in more traditional media.
 
 [22]
 
 That is an essential result of publishing. Accepting plaintiffs' argument would eviscerate Section 230(c)(1) ; a defendant interactive computer service would be ineligible for Section 230(c)(1) immunity by virtue of simply organizing and displaying content exclusively provided by third parties.
 

 Plaintiffs' "matchmaking" argument would also deny immunity for the editorial decisions regarding third-party content that interactive computer services have made since the early days of the Internet. The services have always decided, for example, where on their sites (or other digital property) particular third-party content should reside and to whom it should be shown. Placing certain third-party content on a homepage, for example, tends to recommend that content to users more than if it were located elsewhere on a website. Internet services have also long been able to target the third-party content displayed to users based on, among other things, users' geolocation, language of choice, and
 registration information. And, of course, the services must also decide what type and format of third-party content they will display, whether that be a chat forum for classic car lovers, a platform for blogging, a feed of recent articles from news sources frequently visited by the user, a map or directory of local businesses, or a dating service to find romantic partners. All of these decisions, like the decision to host third-party content in the first place, result in "connections" or "matches" of information and individuals, which would have not occurred but for the internet services' particular editorial choices regarding the display of third-party content. We, again, are unaware of case law denying Section 230(c)(1) immunity because of the "matchmaking" results of such editorial decisions.
 

 Seen in this context, plaintiffs' argument that Facebook's algorithms uniquely form "connections" or "matchmake" is wrong. That, again, has been a fundamental result of publishing third-party content on the Internet since its beginning. Like the decision to place third-party content on a homepage, for example, Facebook's algorithms might cause more such "matches" than other editorial decisions. But that is not a basis to exclude the use of algorithms from the scope of what it means to be a "publisher" under Section 230(c)(1). The matches also might-as compared to those resulting from other editorial decisions-present users with targeted content of even more interest to them, just as an English speaker, for example, may be best matched with English-language content. But it would turn Section 230(c)(1) upside down to hold that Congress intended that when publishers of third-party content become especially adept at performing the functions of publishers, they are no longer immunized from civil liability.
 
 [23]
 

 Second, plaintiffs argue, in effect, that Facebook's use of algorithms is outside the scope of publishing because the algorithms
 
 automate
 
 Facebook's editorial decision-making. That argument, too, fails because "so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific edit[orial] or selection process."
 
 Carafano
 
 ,
 
 339 F.3d at
 
 1124 ;
 
 see
 

 Marshall's Locksmith
 
 ,
 
 925 F.3d at 1271
 
 (holding that "automated editorial act[s]" are protected by Section 230 ) (quoting
 
 O'Kroley v. Fastcase, Inc.
 
 ,
 
 831 F.3d 352
 
 , 355 (6th Cir. 2016) );
 
 cf., e.g.,
 

 Roommates.Com,
 

 521 F.3d at
 
 1172 ;
 
 Herrick
 
 ,
 
 765 F. App'x at 591
 
 . We disagree with plaintiffs that in enacting Section 230 to,
 
 inter alia
 
 , "promote the continued development of the Internet,"
 
 47 U.S.C. § 230
 
 (b)(1), and "preserve the vibrant and competitive free market,"
 
 id
 
 . § 230(b)(2), Congress implicitly intended to restrain the automation of interactive computer services' publishing activities in order for them to retain immunity.
 

 Our dissenting colleague calls for a narrow textual interpretation of Section 230(c)(1) by contending that the Internet was an "afterthought" of Congress in the CDA because the medium received less "committee attention" than other forms of media and that Congress, with Section 230, "tackled only ... the ease with which the Internet delivers indecent or offensive material,
 especially to minors." Dissent at 78. But such a constrained view of Section 230 simply is not supported by the actual text of the statute that Congress passed. In addition to the broad language of Section 230(c)(1) and the pro-Internet-development policy statements in Section 230 (discussed
 
 supra
 
 at 63, 67), Congress announced the following specific findings in Section 230 :
 

 (1) The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.
 

 (2) These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.
 

 (3) The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.
 

 (4) The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.
 

 (5) Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.
 

 47 U.S.C. § 230
 
 (a)(1)-(5). These Congressional statements all point to the benefits of interactive media and "publisher" immunity to interactive computer services when they arrange and transmit information provided by others.
 

 We therefore conclude that plaintiffs' claims fall within Facebook's status as the "publisher" of information within the meaning of Section 230(c)(1).
 

 B. Whether Facebook is the Provider of the Information
 

 We turn next to whether Facebook is plausibly alleged to
 
 itself
 
 be an "information content provider," or whether it is Hamas that provides all of the complained-of content. "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."
 
 47 U.S.C. § 230
 
 (f)(3). If Facebook was a creator or developer, even "in part," of the terrorism-related content upon which plaintiffs' claims rely, then Facebook is an "information content provider" of that content and is not protected by Section 230(c)(1) immunity.
 
 47 U.S.C. § 230
 
 (f)(3). Plaintiffs contend that Facebook's algorithms "develop" Hamas's content by directing such content to users who are most interested in Hamas and its terrorist activities, without those users necessarily seeking that content.
 

 The term "development" in Section 230(f)(3) is undefined. However, consistent with broadly construing "publisher" under Section 230(c)(1), we have recognized that a defendant will not be considered to have developed third-party content unless the defendant directly and "materially" contributed to what made the content itself "unlawful."
 
 LeadClick
 
 ,
 
 838 F.3d at 174
 
 (quoting
 
 Roommates.Com
 
 ,
 
 521 F.3d at
 
 1168 ). This "material contribution" test, as the Ninth Circuit has described it, "draw[s] the line at the 'crucial distinction between, on the one hand, taking actions ... to ... display ... actionable content and, on the other hand, responsibility for what makes the displayed content [itself] illegal or actionable.' "
 
 Kimzey v. Yelp! Inc.
 
 ,
 
 836 F.3d 1263
 
 , 1269 n.4 (9th Cir. 2016) (quoting
 
 Jones
 
 ,
 
 755 F.3d at
 
 413-14 ).
 

 Employing this "material contribution" test, we held in
 
 FTC v. LeadClick
 
 that the defendant LeadClick had "developed" third parties' content by giving specific instructions to those parties on how to edit "fake news" that they were using in their ads to encourage consumers to purchase their weight-loss products.
 
 LeadClick
 
 ,
 
 838 F.3d at 176
 
 . LeadClick's suggestions included adjusting weight-loss claims and providing legitimate-appearing news endorsements, thus "materially contributing to [the content's] alleged unlawfulness."
 
 Id
 
 . (quoting
 
 Roommates.Com
 
 ,
 
 521 F.3d at
 
 1160 ) (alterations in the original).
 
 LeadClick
 
 also concluded that a defendant may, in some circumstances, be a developer of its users' content if it encourages or advises users to provide the specific actionable content that forms the basis for the claim.
 
 See
 ids="3738362" index="64" url="https://cite.case.law/f3d/521/1157/#p1174">
 id.
 

 Similarly, in
 
 Fair Housing Council v. Roommates.Com
 
 ,
 
 521 F.3d at 1172
 
 , the Ninth Circuit determined that-in the context of the Fair Housing Act,
 
 42 U.S.C. § 3601
 

 et seq.
 
 , which prohibits discrimination on the basis of sex, family status, sexual orientation, and other protected classes in activities related to housing-the defendant website's practice of requiring users to use pre-populated responses to answer inherently discriminatory questions about membership in those protected classes amounted to developing the actionable information for purposes of the plaintiffs' discrimination claim
 
 .
 

 Although it did not explicitly adopt the "material contribution" test, the D.C. Circuit's recent decision in
 
 Marshall's Locksmith Service v. Google
 
 ,
 
 925 F.3d 1263
 
 , illustrates how a website's display of third-party information does not cross the line into content development. There, "scam locksmiths"-who were apparently actual locksmiths seeking to mislead consumers with lock emergencies into believing that they were closer in proximity to the emergency location than they actually were-allegedly provided Google, Microsoft, and Yahoo!'s internet mapping services with false locations, some of which were exact street addresses and others which were "less-exact," such as telephone area codes.
 
 Id
 
 . at 1265-70. The internet mapping services of Google, Microsoft, and Yahoo! translated this information into textual and pictorial "pinpoints" on maps that were displayed to the services' users.
 
 Id
 
 . at 1269. The D.C. Circuit concluded that this "translation" of the third-party information by the interactive computer services did not develop that information (or create new content) because the underlying "information [was] entirely provided by the third party, and the choice of
 
 presentation
 
 " fell within the interactive computer services' prerogative as publishers.
 
 Id
 
 . (emphasis added).
 

 As to the "less-exact" location information, such as area codes, provided by the scam locksmiths, the plaintiffs also argued that the mapping services' algorithmic translation of this information into exact pinpoint map locations developed or created the misleading information.
 
 Id
 
 . at 1269-70. The D.C. Circuit also rejected that argument, holding that "defendants' translation of [imprecise] third-party information into map pinpoints does not convert them into 'information content providers' because defendants use a neutral algorithm to make that translation."
 
 Id
 
 . at 1270. In using the term "neutral," the court observed that the algorithms were alleged to make no distinction between "scam" and other locksmiths and that the algorithms did not materially alter (i.e., they "hew[ed] to") the underlying information provided by the third parties.
 
 Id
 
 . at 1270 n.5, 1270-71.
 

 Here, plaintiffs' allegations about Facebook's conduct do not render it responsible for the Hamas-related content. As an initial matter, Facebook does not edit (or
 suggest edits) for the content that its users-including Hamas-publish. That practice is consistent with Facebook's Terms of Service, which emphasize that a Facebook user "own[s] all of the content and information [the user] post[s] on Facebook, and [the user] can control how it is shared through [the user's] privacy and application settings." App'x 252.
 

 Nor does Facebook's acquiring certain information from users render it a developer for the purposes of Section 230. Facebook requires users to provide only basic identifying information: their names, telephone numbers, and email addresses. In so doing, Facebook acts as a "neutral intermediary."
 
 LeadClick
 
 ,
 
 838 F.3d at 174
 
 . Moreover, plaintiffs concede in the pleadings that Facebook does not publish that information,
 
 cf., e.g.,
 

 Roommates.Com
 
 ,
 
 521 F.3d at 1172
 
 , and so such content plainly has no bearing on plaintiffs' claims.
 

 Plaintiffs' allegations likewise indicate that Facebook's algorithms are content "neutral" in the sense that the D.C. Circuit used that term in
 
 Marshall's Locksmith
 
 : The algorithms take the information provided by Facebook users and "match" it to other users-again, materially unaltered-based on objective factors applicable to any content, whether it concerns soccer, Picasso, or plumbers.
 
 [24]
 
 Merely arranging and displaying others' content to users of Facebook through such algorithms-even if the content is not actively sought by those users-is not enough to hold Facebook responsible as the "develop[er]" or "creat[or]" of that content.
 
 See, e.g.,
 

 Marshall's Locksmith
 
 ,
 
 925 F.3d at
 
 1269-71 ;
 
 Roommates.Com,
 

 521 F.3d at 1169-70
 
 .
 

 Plaintiffs' arguments to the contrary are unpersuasive. For one, they point to the Ninth Circuit's decision in
 
 Roommates.Com
 
 as holding that requiring or encouraging users to provide
 
 any
 
 particular information whatsoever to the interactive computer service transforms a defendant into a developer of that information. The
 
 Roommates.Com
 
 holding, however, was not so broad; it concluded only that the site's conduct in requiring users to select from "a limited set of pre-populated answers" to respond to particular "discriminatory questions" had a content-development effect that was actionable in the context of the Fair Housing Act.
 
 See
 

 521 F.3d at 1166
 
 . There is no comparable allegation here.
 

 Plaintiffs also argue that Facebook develops Hamas's content because Facebook's algorithms make that content more "visible," "available," and "usable." Appellants' Br. at 45-46. But making information more available is, again, an essential part of traditional
 
 publishing
 
 ; it does not amount to "developing" that information within the meaning of Section 230. Similarly, plaintiffs assert that Facebook's algorithms suggest third-party content to users "based on what Facebook believes will cause the user to use Facebook as much as possible" and that Facebook intends to "influence" consumers' responses to that content. Appellants' Br. 48. This does not describe anything more than Facebook vigorously fulfilling its role as a publisher. Plaintiffs' suggestion that publishers must have no role in organizing or distributing third-party content in order to avoid "develop[ing]" that content is both ungrounded
 in the text of Section 230 and contrary to its purpose.
 

 Finally, we note that plaintiffs also argue that Facebook should not be afforded Section 230 immunity because Facebook has chosen to undertake efforts to eliminate objectionable and dangerous content but has not been effective or consistent in those efforts. However, again, one of the purposes of Section 230 was to ensure that interactive computer services should not incur liability as developers or creators of third-party content merely because they undertake such efforts-even if they are not completely effective.
 
 [25]
 

 We therefore conclude from the allegations of plaintiffs' complaint that Facebook did not "develop" the content of the Facebook postings by Hamas and that Section 230(c)(1) applies to Facebook's alleged conduct in this case.
 

 III. Whether Applying Section 230(c)(1) to Plaintiffs' Claims Would Impair the Enforcement of a Federal Criminal Statute
 

 Plaintiffs also argue that Section 230(c)(1) may not be applied to their claims because that would impermissibly "impair the enforcement" of a "Federal criminal statute." Appellant's Br. at 52 (quoting
 
 47 U.S.C. § 230
 
 (e)(1) ). Section 230(e)(1), entitled, "No effect on criminal law," is one of the enumerated exceptions to the application of Section 230(c)(1) immunity. It provides that "[n]othing in ... section [230] shall be construed to impair the enforcement of ... any [ ] Federal criminal statute."
 
 47 U.S.C. § 230
 
 (e)(1). Plaintiffs observe that 18 U.S.C. §§ 2339A, 2339B, and 2339C, which criminalize providing material support for terrorism, providing material support for foreign terrorist organizations, and financing terrorism, respectively, are federal criminal statutes. Plaintiffs argue that preventing them from bringing an action under the statute providing for "civil remedies" for individuals injured "by reason of an act of international terrorism,"
 
 18 U.S.C. § 2333
 
 (a), would "impair the enforcement" of those criminal statutes within the meaning of
 
 47 U.S.C. § 230
 
 (e)(1). In response, citing the First Circuit's decision in
 
 Backpage.com,
 

 817 F.3d at 23-24
 

 ,
 
 Facebook argues that Section 230(e)(1) pertains only to criminal enforcement actions brought by a prosecutor, not civil actions such as this.
 

 We agree with the district court's conclusion that Section 230(e)(1) is inapplicable in this civil action. Even accepting,
 
 arguendo
 
 , plaintiffs' assertion that a civil litigant could be said to "enforce" a criminal statute through a separate civil remedies provision, any purported ambiguity in Section 230(e)(1) is resolved by its title, "No effect on criminal law."
 
 [26]
 
 "Criminal law" concerns "prosecuting and punishing offenders" and is "contrasted with civil law," which, as here, concerns "private relations between individuals."
 
 Criminal Law, Civil Law
 
 , Oxford English Dictionary (3d ed. 2010). Furthermore, as the First Circuit pointed out in
 
 Jane Doe No. 1 v. Backpage.com, LLC
 
 , "where Congress wanted to include both civil and criminal remedies in CDA provisions, it did so through broader language."
 
 817 F.3d at 23
 
 . Section 230(e)(4), for example, states that Section 230 "should not 'be construed to limit the application of the Electronic Communications Privacy Act of 1986,' a
 statute that contains both criminal penalties and civil remedies."
 

 Id.
 

 (first quoting
 
 18 U.S.C. § 230
 
 (e)(4), then citing
 
 18 U.S.C. §§ 2511
 
 , 2520 ). In light of the presumption that the use of "different words within the same statutory scheme is deliberate," the fact that Congress's word choice in "[p]reserving the 'application' of this Act" is distinct from its "significantly narrower word choice in safeguarding the 'enforcement' of federal criminal statutes" counsels against the broad reading of Section 230(e)(1) urged by plaintiffs.
 

 Id.
 

 (citing
 
 Sosa v. Alvarez-Machain
 
 ,
 
 542 U.S. 692
 
 , 711 n.9,
 
 124 S.Ct. 2739
 
 ,
 
 159 L.Ed.2d 718
 
 (2004) ).
 
 [27]
 
 We therefore join the First Circuit in concluding that Section 230(e)(1) is "quite clearly ... limited to criminal prosecutions."
 
 Backpage.com
 
 ,
 
 817 F.3d at 23
 
 . Accordingly, Section 230(e)(1) provides no obstacle to the application of Section 230(c)(1) in this case.
 

 IV. Whether the Anti-Terrorism Act's Civil Remedies Provision,
 
 18 U.S.C. § 2333
 
 , Implicitly Narrowed or Repealed Section 230(c)(1)
 

 Plaintiffs also argue that the ATA's civil remedies provision,
 
 18 U.S.C. § 2333
 
 , irreconcilably conflicts with Section 230 and impliedly repealed it when Congress amended Section 2333 by adopting the Justice Against Sponsors of Terrorism Act ("JASTA") in 2016. JASTA, among other things, added civil liability for aiding and abetting and civil conspiracy to Section 2333, with a stated purpose of "provid[ing] civil litigants with the broadest possible basis ... to seek relief" against material supporters of terrorism. Pub. L. 114-222, § 2(b),
 
 130 Stat. 852
 
 , 853 (2016).
 

 "[R]epeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest."
 
 Nat'l Ass'n of Home Builders v. Defs. of Wildlife
 
 ,
 
 551 U.S. 644
 
 , 662,
 
 127 S.Ct. 2518
 
 ,
 
 168 L.Ed.2d 467
 
 (2007) (citation, internal quotation marks, and alterations omitted). In other words, "[a]n implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute."
 
 Branch v. Smith,
 

 538 U.S. 254
 
 , 273,
 
 123 S.Ct. 1429
 
 ,
 
 155 L.Ed.2d 407
 
 (2003) (citation and internal quotation marks omitted). Here, there is no irreconcilable conflict between the statutes. Section 230 provides an affirmative defense to liability under Section 2333 for only the narrow set of defendants and conduct to which Section 230 applies. JASTA merely expanded Section 2333's cause of action to secondary liability; it provides no obstacle-explicit or implicit-to applying Section 230.
 

 V. Whether Applying Section 230(c)(1) to Plaintiffs' Claims Would Be Impermissibly Extraterritorial
 

 Plaintiffs also argue that the presumption against the extraterritorial application of federal statutes bars applying Section 230(c)(1) to their claims because Hamas posted content and conducted the attacks from overseas, and because Facebook's employees who failed to take down Hamas's content were allegedly located outside the United States, in Facebook's
 foreign facilities. In response, Facebook contends that Section 230(c)(1) merely limits civil liability in American courts, a purely domestic application.
 

 Under the canon of statutory interpretation known as the "presumption against extraterritoriality," "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."
 
 RJR Nabisco, Inc. v. European Cmty.,
 
 --- U.S. ----,
 
 136 S. Ct. 2090
 
 , 2100,
 
 195 L.Ed.2d 476
 
 (2016). The Supreme Court has instructed courts to apply "a two-step framework for analyzing extraterritoriality issues."
 
 Id
 
 . at 2101. "At the first step, we ask whether the presumption against extraterritoriality has been rebutted-that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially."
 
 Id
 
 .
 

 If the statute is not extraterritorial on its face, then "at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.' "
 
 Id
 
 . "The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate."
 
 WesternGeco LLC v. ION Geophysical Corp.
 
 , --- U.S. ----,
 
 138 S. Ct. 2129
 
 , 2137,
 
 201 L.Ed.2d 584
 
 (2018) (citation, internal quotation marks, and alterations omitted). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad ...."
 
 RJR Nabisco,
 

 136 S. Ct. at 2101
 
 . "[B]ut if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."
 
 Id
 
 .
 

 The two-step framework arguably does not easily apply to a statutory provision that affords an affirmative defense to civil liability. Indeed, it is unclear how an American court could apply such a provision "extraterritorially." Even if it could be applied extraterritorially-say, by somehow treating the defendant's conduct rather than the lawsuit itself as the "focus" of a liability-limiting provision-the presumption against extraterritoriality primarily "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries."
 
 Id
 
 . at 2100. Allowing a plaintiff's claim to go forward because the cause of action applies extraterritorially, while then applying the presumption to block a different provision setting out defenses to that claim, would seem only to increase the possibility of international friction. Such a regime could also give plaintiffs an advantage when they sue over extraterritorial wrongdoing that they would not receive if the defendant's conduct occurred domestically. It is doubtful that Congress ever intends such a result when it writes provisions limiting civil liability.
 

 The Ninth Circuit addressed this issue in
 
 Blazevska v. Raytheon Aircraft Co.
 
 ,
 
 522 F.3d 948
 
 (9th Cir. 2008), which was decided prior to the Supreme Court's adoption of the two-step extraterritoriality framework. The plaintiffs in
 
 Blazevska
 
 argued that the General Aviation Revitalization Act's ("GARA") statute of repose could not limit the defendant's liability because, like here, certain events related to plaintiffs' claims occurred overseas.
 

 Id.
 

 at 950
 
 . The Ninth Circuit disagreed, holding that the presumption against extraterritoriality was inapplicable to a liability-limiting statute. It found that GARA did not "impermissibly regulate conduct that has occurred abroad," and instead,
 

 merely eliminates the power of any party to bring a suit for damages against a general aviation aircraft manufacturer, in a U.S. federal or state court, after the limitation period. The only conduct it could arguably be said to regulate is the ability of a party to initiate an action for damages against a manufacturer in American courts-an entirely domestic endeavor. Congress has no power to tell courts of foreign countries whether they could entertain a suit against an American defendant.
 

 Id
 
 . at 953. "Accordingly," the Ninth Circuit held, "the presumption against extraterritoriality simply is not implicated by GARA's application."
 
 Id
 
 .
 

 The Supreme Court has left open the question of whether certain types of statutes might not be subject to the presumption against extraterritoriality.
 
 See
 

 WesternGeco
 
 ,
 
 138 S. Ct. at 2136
 
 (noting, without deciding, the question whether "the presumption against extraterritoriality should never apply to statutes ... that merely provide a general damages remedy for conduct that Congress has declared unlawful"). However, we need not decide here whether the presumption against extraterritoriality is "simply ... not implicated,"
 
 Blazevska
 
 ,
 
 522 F.3d at 953
 
 , by statutes that merely limit civil liability, or whether the two-step
 
 RJR Nabisco
 
 framework must be applied, because that framework is workable in this context and compels the same result. At step two, we conclude from the text of Section 230, particularly the words "shall be treated," that its primary purpose is limiting civil liability in American courts.
 
 [28]
 
 The regulated conduct-the litigation of civil claims in federal courts-occurs entirely domestically in its application here. We thus hold that the presumption against extraterritoriality is no barrier to the application of Section 230(c)(1) in this case.
 
 [29]
 

 VI. Foreign Law Claims
 

 Turning next to plaintiffs' foreign tort claims, the parties disagree as to the reach of Section 230 immunity. The district court held that Section 230 applies to foreign law claims brought in United States courts, but it did not address the basis for its exercise of subject matter jurisdiction over those claims. Before we can reach the merits of those causes of action, including the applicability of Section 230, we must independently ensure the basis for federal subject matter jurisdiction.
 
 Ruhrgas AG v. Marathon Oil Co.
 
 ,
 
 526 U.S. 574
 
 , 583,
 
 119 S.Ct. 1563
 
 ,
 
 143 L.Ed.2d 760
 
 (1999).
 

 Plaintiffs allege that, under
 
 28 U.S.C. § 1332
 
 (a)(2), we have diversity jurisdiction over their foreign law claims purportedly brought between "citizens of a State and citizens or subjects of a foreign state." It is well established, however, that "United States citizens who are domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state, and § 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties."
 
 Cresswell v. Sullivan & Cromwell
 
 ,
 
 922 F.2d 60
 
 , 68 (2d Cir. 1990). In other words, "a suit by or against United States citizens domiciled abroad may not
 be premised on diversity."
 
 Id
 
 . ;
 
 see also
 

 Newman-Green, Inc. v. Alfonzo-Larrain
 
 ,
 
 490 U.S. 826
 
 , 829,
 
 109 S.Ct. 2218
 
 ,
 
 104 L.Ed.2d 893
 
 (1989) (stating that "stateless" United States citizens may not be parties to diversity-based suits).
 

 Here, a substantial majority of the plaintiffs are alleged to be United States citizens domiciled in Israel.
 
 [30]
 
 A suit based on diversity jurisdiction may not proceed with these plaintiffs as parties.
 

 In addition, "[i]t is well established that for a case to come within [ § 1332 ] there must be complete diversity,"
 
 Cresswell
 
 ,
 
 922 F.2d at 68
 
 , and the complaint must set forth the citizenship of the parties,
 
 Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.
 
 ,
 
 87 F.3d 44
 
 , 47 (2d Cir. 1996). Plaintiffs' complaint fails to allege the state citizenship, if any, of U.S.-citizen plaintiffs Taylor Force, Kristin Ann Force, Yaakov Naftali Fraenkel, Chaya Zissel Braun, Richard Lakin, or the minor-children plaintiffs S.S.R., M.M.R., R.M.R. and S.Z.R. We thus cannot determine on the present record whether those plaintiffs are of diverse citizenship from Facebook. Indeed, only
 
 two
 
 plaintiffs
 
 -
 
 Stuart Force and Robbi Force
 
 -
 
 are alleged to be of diverse citizenship to Facebook.
 

 The joinder of Israel-domiciled U.S.-citizen plaintiffs requires us either to dismiss the diversity-based claims altogether, or exercise our discretion to: 1) dismiss those plaintiffs who we determine are "dispensable jurisdictional spoilers;" or 2) vacate in part the judgment of the district court and remand for it to make that indispensability determination and to determine whether dismissal of those individuals would be appropriate.
 
 SCS Commc'ns, Inc. v. Herrick Co.
 
 ,
 
 360 F.3d 329
 
 , 335 (2d Cir. 2004). As for the plaintiffs for whom no state citizenship is alleged, we have discretionary authority to accept submissions for the purpose of amending the complaint on appeal, or we could remand for amendment.
 
 See
 

 Leveraged Leasing
 
 ,
 
 87 F.3d at 47
 
 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." (quoting
 
 28 U.S.C. § 1653
 
 )).
 

 We decline to exercise our discretion to attempt to remedy these jurisdictional defects. This is not a case in which a small number of nondiverse parties defeats jurisdiction, but rather one in which-after multiple complaints have been submitted-most of the plaintiffs are improperly joined. Moreover, the case remains at the pleading stage, with discovery not yet having begun. Proceeding with the few diverse plaintiffs would be inefficient given the expenditure of judicial and party resources that would be required to address the jurisdictional defects. The most appropriate course is for any diverse plaintiffs to bring a new action and demonstrate subject matter jurisdiction in that action.
 
 [31]
 
 Accordingly, plaintiffs' foreign law claims are dismissed, without prejudice.
 
 [32]
 

 CONCLUSION
 

 For the foregoing reasons, we
 
 AFFIRM
 
 the judgment of the district court as to plaintiffs' federal claims and
 
 DISMISS
 
 plaintiffs' foreign law claims.
 

 As used here, the term "complaint" refers to both the allegations of the First Amended Complaint and those of the proposed second amended complaint, which sought to supplement the prior complaint.
 

 According to Facebook, hundreds of millions of Facebook pages are maintained on its platform.
 

 When we refer to "Hamas" as users of Facebook in this opinion, we mean individuals alleged to be Hamas members or supporters, as well as various Hamas entities that are alleged to have Facebook pages.
 

 Plaintiffs' complaint relies extensively on, and incorporates by reference, Facebook's Terms of Service and Community Standards (together, "terms"). The publicly available terms are also subject to judicial notice.
 
 See
 
 Fed. R. Evid. 201(b)(2) ;
 
 see also, e.g.,
 

 23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health
 
 ,
 
 685 F.3d 174
 
 , 183 n.7 (2d Cir. 2012) (taking judicial notice of content of website whose authenticity was not in question). With the exception of such terms that plaintiffs allege Facebook actually follows in practice, we recount this information only for the limited purpose of setting forth Facebook's stated representations about its policies and practices and to provide context for plaintiffs' allegations, but not for the truth of whether Facebook follows those policies.
 

 Facebook's sign-up webpage states that by clicking "Sign Up," prospective users agree to Facebook's Terms of Service, Data Policy, and Cookies Policy-all of which are hyperlinked from that page.
 
 Create a New Account
 
 , Facebook, https://www.facebook.com/r.php (last visited June 26, 2019). As indicated above, the Terms of Service also purport to incorporate Facebook's Community Standards.
 

 Plaintiffs included this testimony in the appendix on appeal and attached and referred to the testimony in their brief responding to the district court's order to show cause for why their proposed second amended complaint was not futile. We recount such testimony only for the purposes described
 
 supra
 
 n.5.
 

 Facebook has been criticized recently-and frequently-for not doing enough to take down offensive or illegal content.
 
 E.g.
 
 , Cecilia Kang,
 
 Nancy Pelosi Criticizes Facebook for Handling of Altered Videos
 
 , N.Y. Times (May 29, 2019), https://www.nytimes.com/2019/05/29/technology/facebook-pelosi-video.html; Kalev Leetaru,
 
 Countering Online Extremism Is Too Important to Leave to Facebook
 
 , FORBES (May 9, 2019), https://www.forbes.com/sites/kalevleetaru/2019/05/09/countering-online-extremism-is-too-important-to-leave-to-facebook; Julia Fioretti,
 
 Internet Giants Not Doing Enough to Take Down Illegal Content: EU
 
 , Reuters (Jan. 9, 2018), https://www.reuters.com/article/us-eu-internet-meeting/internet-giants-not-doing-enough-to-take-down-illegal-content-eu-idUSKBN1EY2BL;
 
 see
 

 Staehr v. Hartford Fin. Servs. Grp., Inc.
 
 ,
 
 547 F.3d 406
 
 , 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the
 
 fact
 
 that press coverage ... contained certain information, without regard to the truth of their contents.").
 

 The parties moved jointly under
 
 28 U.S.C. § 1404
 
 (a) to transfer the case to the Eastern District of New York because plaintiffs' counsel had already filed the
 
 Cohen
 
 action there,
 
 see infra
 
 n.11, and resolving both cases in the same district, the parties argued, would be efficient and convenient.
 

 18 U.S.C. § 2333
 
 provides civil remedies for injuries suffered through acts of international terrorism. Plaintiffs also cite to 18 U.S.C. § 2339A (providing material support for terrorism) and § 2339B (providing material support or resources to a designated foreign terrorist organization).
 

 In the same opinion, the district court also dismissed for lack of Article III standing the claims brought in a separate action by 20,000 Israeli citizens who, according to the district court, claimed "to be threatened only by potential future attacks." S. App'x 3. The district court referred to those plaintiffs as the "Cohen Plaintiffs" and to the plaintiffs in this appeal as the "Force Plaintiffs."
 
 Id
 
 . at 1. The Cohen Plaintiffs did not appeal.
 
 Cohen v. Facebook
 
 , 16-cv-04453-NGG-LB (E.D.N.Y.).
 

 We have jurisdiction over this appeal from a final judgment.
 
 28 U.S.C. § 1291
 
 .
 

 Plaintiffs do not distinguish their arguments between their First Amended Complaint, which the district court dismissed, and their proposed second amended complaint, which the district court determined was futile. We agree that the Section 230(c)(1) issues raised by both complaints are materially indistinguishable.
 

 We refer to "content" and "information" synonymously in this opinion.
 

 Plaintiffs argue that the district court prematurely applied Section 230(c)(1), an affirmative defense, because discovery might show that Facebook was indeed a "developer" of Hamas's content. However, the application of Section 230(c)(1) is appropriate at the pleading stage when, as here, the "statute's barrier to suit is evident from the face of" plaintiffs' proposed complaint.
 
 Ricci
 
 ,
 
 781 F.3d at
 
 28 ;
 
 see also
 

 Marshall's Locksmith Serv. Inc. v. Google, LLC
 
 ,
 
 925 F.3d 1263
 
 , 1267-68 (D.C. Cir. 2019) (affirming dismissal of claims at pleading stage based on Section 230(c)(1) immunity).
 

 Section 230(c)(2), which, like Section 230(c)(1), is contained under the subheading "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material,"
 
 47 U.S.C. § 230
 
 (c), responds to
 
 Stratton
 
 even more directly. It provides that "[n]o provider or user of an interactive computer service shall be held liable on account of-(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in [Section 230(c)(1) ]."
 

 Id.
 

 § 230(c)(2).
 

 Because, as is discussed later in this opinion, plaintiffs' foreign law claims are dismissed on jurisdictional grounds, our discussion of Section 230(c)(1) immunity is confined to plaintiffs' federal claims.
 

 Plaintiffs also argue that because publication is not an explicit element of their federal anti-terrorism claims, Section 230(c)(1) does not provide Facebook with immunity. However, it is well established that Section 230(c)(1) applies not only to defamation claims, where publication is an explicit element, but also to claims where "the duty that the plaintiff alleges the defendant violated derives from the defendant's
 
 status or conduct
 
 as a publisher or speaker."
 
 LeadClick
 
 ,
 
 838 F.3d at 175
 
 (quoting
 
 Barnes v. Yahoo!, Inc.
 
 ,
 
 570 F.3d 1096
 
 , 1102 (9th Cir. 2009) ) (emphasis added) (internal quotation marks omitted). "Thus, courts have invoked the prophylaxis of section 230(c)(1) in connection with a wide variety of causes of action, including housing discrimination, negligence, and securities fraud and cyberstalking."
 
 Backpage.com,
 

 817 F.3d at 19
 
 (internal citations omitted);
 
 see also
 

 Marshall's Locksmith
 
 ,
 
 925 F.3d at 1267
 
 ("As courts uniformly recognize, § 230 immunizes internet services for third-party content that they publish, ... against causes of action of all kinds.");
 
 HomeAway.com, Inc. v. City of Santa Monica
 
 ,
 
 918 F.3d 676
 
 , 684 (9th Cir. 2019) ("[W]e have repeatedly held the scope of [Section 230 ] immunity to reach beyond defamation cases.").
 

 "When a term goes undefined in a statute, we give the term its ordinary meaning."
 
 Taniguchi v. Kan Pac. Saipan, Ltd.
 
 ,
 
 566 U.S. 560
 
 , 566,
 
 132 S.Ct. 1997
 
 ,
 
 182 L.Ed.2d 903
 
 (2012).
 

 To the extent that plaintiffs rely on their undeveloped contention that the algorithms are "designed to radicalize," Appellants' Br. 51, we deem that argument waived. In addition, this allegation is not made in plaintiffs' complaints.
 

 While lacking precedential value, "[w]e are, of course, permitted to consider summary orders for their persuasive value, and often draw guidance from them in later cases."
 
 Brault v. Soc. Sec. Admin., Comm'r
 
 ,
 
 683 F.3d 443
 
 , 450 n.5 (2d Cir. 2012).
 

 As journalist and author Tom Standage has observed, "[M]any of the ways in which we share, consume, and manipulate information, even in the Internet era, build upon habits and conventions that date back centuries." Tom Standage,
 
 Writing on the Wall: Social Media - The First 2000 Years
 
 5 (2013).
 
 See also
 
 Tom Standage,
 
 Benjamin Franklin, Social Media Pioneer
 
 , Medium (Dec. 10, 2013), https://medium.com/new-media/benjamin-franklin-social-media-pioneer-3fb505b1ce7c ("Small and local, with circulations of a few hundred copies at best, [colonial] newspapers consisted in large part of letters from readers, and reprinted speeches, pamphlets and items from other papers. They provided an open platform through which people could share and discuss their views with others. They were, in short, social media.").
 

 The dissent contends that our holding would necessarily immunize the dissent's hypothetical phone-calling acquaintance who brokers a connection between two published authors and facilitates the sharing of their works.
 
 See
 
 Dissent at 76. We disagree, for the simple reason that Section 230(c)(1) immunizes publishing activity only insofar as it is conducted by an "interactive computer service." Moreover, the third-party information must be "provided through the Internet or any other interactive computer service."
 
 47 U.S.C. § 230
 
 (f)(3).
 

 We do not mean that Section 230 requires algorithms to treat all types of content the same. To the contrary, Section 230 would plainly allow Facebook's algorithms to, for example, de-promote or block content it deemed objectionable. We emphasize only-assuming that such conduct could constitute "development" of third-party content-that plaintiffs do not plausibly allege that Facebook augments terrorist-supporting content primarily on the basis of its subject matter.
 

 See supra
 
 , Discussion, Part I.
 

 "[W]here the text is ambiguous, a statute's titles can offer 'a useful aid in resolving [the] ambiguity.' "
 
 Lawson v. FMR LLC
 
 ,
 
 571 U.S. 429
 
 , 465,
 
 134 S.Ct. 1158
 
 ,
 
 188 L.Ed.2d 158
 
 (2014) (quoting
 
 FTC v. Mandel Bros
 
 .,
 
 Inc.,
 

 359 U.S. 385
 
 , 388-89,
 
 79 S.Ct. 818
 
 ,
 
 3 L.Ed.2d 893
 
 (1959) (alterations in original)).
 

 We do not here decide whether the word "enforcing" in a different provision, Section 230(e)(3), necessarily has the same meaning as "enforcement" in Section 230(e)(1), given their different linguistic contexts.
 
 See
 

 47 U.S.C. § 230
 
 (e)(3) ("Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.");
 
 Beharry v. Ashcroft
 
 ,
 
 329 F.3d 51
 
 , 61 (2d Cir. 2003) (Sotomayor,
 
 J
 
 .) ("Usually identical words in different sections mean identical things, but not invariably. All depends on context." (citation omitted)).
 

 Although "a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry," courts may instead "start[ ] at step two in appropriate cases."
 
 RJR Nabisco,
 

 136 S. Ct. at
 
 2101 n.5.
 

 Because we conclude that the affirmative defense of Section 230(c)(1) applies, we need not reach Facebook's alternative argument that plaintiffs' complaint does not plausibly allege that, absent such immunity, Facebook assisted Hamas under the federal antiterrorism claims.
 

 A representative of a decedent's estate is "deemed to be a citizen only of the same State as the decedent."
 
 28 U.S.C. § 1332
 
 (c)(2).
 

 Plaintiffs do not assert supplemental jurisdiction under
 
 28 U.S.C. § 1367
 
 . All claims over which we have original jurisdiction are dismissed at the pleading stage,
 
 see
 

 id
 
 . § 1367(c)(3), and, by plaintiffs' own argument, some of the foreign claims "differ[ ] markedly from American concepts of ... liability," Appellants' Br. 59;
 
 see
 

 id
 
 . § 1367(c)(1). Therefore, even assuming that plaintiffs' foreign law claims form "part of the same case or controversy" as their federal claims,
 
 28 U.S.C. § 1367
 
 (a), we decline to exercise supplemental jurisdiction here.
 

 Because plaintiffs' foreign law claims are dismissed on jurisdictional grounds, we express no opinion as to the district court's conclusion that Section 230 applies to foreign law claims brought in United States courts.